TERESA BYRD,                    )
                               )
        Plaintiff,             )
                               )
v.                             )        No. 1:10-00025
                               )        JUDGE HAYNES
                               )
PRUDENTIAL INSURANCE COMPANY    )
OF AMERICA,                     )
                               )
        Defendant.             )

## M E M O R A N D U M

Plaintiff, Teresa Byrd, filed this action under the Employees Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001 et seq. seeking an award of long-term disability benefits ("LTD") from

Defendant Prudential Insurance Company of America, the Administrator of Plaintiff's employee

benefits plan. The Defendant filed the Administrative Record ("AR") (Docket Entry No. 15).

Before the Court is Plaintiff's motion for judgment on the administrative record (Docket

Entry No. 25) and Defendant's response (Docket Entry No. 27). In sum, Plaintiff argues that

Defendant's denial of LTD benefits was not based on substantial evidence citing: (1) Defendant's

conflict of interest; (2) Defendant's disregard of Plaintiff's treating physicians' medical opinions and

complete reliance on its consultants' opinions; (3) Defendant's failure to provide any information

about the consultants precluded Plaintiff from submitting additional information to Defendant's

consultants; (4) Defendant's failure to include its policies applicable to Plaintiff's claim in the

administrative record for Plaintiff's appeal; (5) Defendant's consultants failure to author the reports

attributed to them; (6) Defendant's consultants' failure to consult Plaintiff's treating physicians; (7) Defendant's consultants failure to consider the impact of Plaintiff's sleep disorder and resulting chronic fatigue; and (8) Defendant's violation of ERISA's regulations and the terms of the Plan by relying on the same medical consultants to deny Plaintiff's initial claim and appeal.

Defendant contends, in sum, that: (1) Defendant did not owe any duty to provide Plaintiff with correspondence, reports, or policies regarding its independent consultants prior to its final determination; (2) Defendant's refusal to disclose operational policies prior to issuing its final decision was not unreasonable; and (3) Defendant's denial of LTD benefits was neither arbitrary nor capricious.

For the reasons set forth below, the Court concludes that Defendant's decision to deny Plaintiff long-term disability benefits was neither arbitrary nor capricious as the Defendant presented a reasoned explanation based upon the medical evidence in the denial of Plaintiff's claim. Under Sixth Circuit precedent, the Defendant's hearing process does not violate ERISA.

## A. REVIEW OF THE RECORD

### 1. Plaintiff's Work History

Telephone and Data Systems, Inc. ("TDSI") hired Plaintiff as a "Sales Advisor, Residential" until on or about April 11, 2007. (Docket Entry No. 15, AR at 466, 463). TDSI is the policyholder of a long-term disability plan that is issued and administered by Defendant Prudential. (Docket Entry No. 4, Answer at ¶ 12). The Policy provides long-term disability benefits to employees who become disabled as defined in the Policy. (Docket Entry No. 15, AR at 589). The policy grants Prudential "the sole discretion to interpret the terms of the group Contract, to make factual findings, and to determine eligibility for benefits." Id. at 625.

The Policy defines disability as follows:

• you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

• you are under the **regular care** of a **doctor**, and

• you have a 20% or more loss in your **monthly earnings** due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:

• you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience; and

• you are under the regular care of a doctor.

. . .

Prudential will assess your ability to work and the extent to which you are able to work by considering the facts and opinions from:

• your doctors; and
• doctors, other medical practitioners or vocational experts of our choice.

. . .

**Material and substantial duties** means duties that:

• are normally required for the performance of your regular occupation; and

• cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

**Regular occupation** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

**Sickness** means any disorder of your body or mind . . . .

Id. at 589-90 (emphasis in original).

An employee must be continuously disabled through the elimination period to receive LTD benefits. Id. at 590. The "Elimination Period" is the six months that a claimant must be disabled before the benefits are payable. Id. at 591. To obtain benefits, a claimant must submit "[a]ppropriate documentation of the disbaling disorder or critical illness." Id. at 612.

## 2. Plaintiff's Medical Records

On October 1, 2003, Dr. Joseph Hall, Plaintiff's primary care physician noted that Plaintiff was suffering from migraine headaches and possibly fibromyalgia. Dr. Hall also recommended a sleep study. Id. at 316. After an examination on December 30, 2003, Dr. Hall diagnosed Plaintiff's medical problems to be hypertension, migraines and depression. Id. at 318. Plaintiff saw Dr. Hall again on May 12, 2004, noting her continuing migraine headaches for which he prescribed Imitrex. Id. at 000319.

On June 25, 2004, Dr. Hall examined Plaintiff for complaints of fatigue, "hurts all over" and a knot between her shoulders. Id. at 320. On October 21, 2004, Plaintiff also complained of migraine headaches three times a week, fatigue and vertigo when standing. Id. at 323. On June 29, 2005, Dr. Hall deemed Plaintiff's hypertension to be controlled, her headaches to have improved, but found continued depression and fatigue. Id. at 324. Plaintiff did not see Dr. Hall again until April 24, 2006, with complaints of depression, migraine headaches and fatigue. Id. at 327.

On August 23, 2006, Plaintiff returned to see Dr. Hall with complaints of depression, fatigue, migraine headaches, poor sleep and joint pain. Id. at 329. Dr. Hall prescribed Wellbutrin. Id. Plaintiff's laboratory report revealed Plaintiff's C3 serum levels to be elevated, reflecting the possibility of lupus. Id. at 92. Dr. Hall then referred Plaintiff to a rheumatologist. Id.

On September 25, 2006, Dr. Joseph Huston, a rheumatologist, examined Plaintiff and did not believe that Plaintiff had "lupus or any other recognizable inflammatory or autoimmune rheumatic disease to explain her current symptoms or reported laboratory abnormalities." Id. at 60, 154. Dr. Huston noted that "[i]n addition to her obesity, I believe she is depressed which further confounds the interpretation of her fatigue and arthralgias." Id. at 154.

On November 10, 2006, after a follow-up visit with Plaintiff, Dr. Huston wrote to Dr. Hall as follows:

> Teresa returned today for her scheduled follow-up visit. She showed no beneficial response to either the prednisone taper or Diclofenac which further supports the clinical impression that she does not have an underlying inflammatory disease. She continues to complain of sleepiness and low energy level which are as problematic to her as the myalgias and arthralgias. Although I have attempted to reassure her that I did not believe she had a serious underlying musculoskeletal problem, she became quite tearful and seems to be disappointed with no specific diagnosis.
>
> I feel **depression** is clearly playing a significant role in her symptoms complex although she is in denial as to it being a contributing factor. She does not report any sleep impairment but a fibromyalgia syndrome could be a contributing factor as well.
>
> I recommending replacing her Diclofenac with a brief trial of Meclomen (100 mg twice daily for at least 10 days) followed by a brief trial of Ultracet (two tablets twice daily for least 10 days) before giving up on an inflammatory/analgesic medications. I recommended she consult with you about antidepressant therapy (her husband was in agreement) and would consider Effexor. I was tempted to give her Lyrica which might be reasonable alternative approach. I plan to see her at least once again in 4 months. I also advised her that a trochanteric bursal injection to the right hip region may prove beneficial if the new medications don't provide any relief to this area.

Id. at 157 (emphasis in original).

On April 10, 2007, Plaintiff underwent an MRI of her of lumbar spine that revealed the following:

> 1. Postoperative change of right laminectomy at L4-L5. No recurrent disc herniation is evident. Mild facet degenerative changes. Osteophytic ridging is also noted at this

level with disc bulge to the right of midline. Moderate acquired right neural foraminal stenosis with mild left neural foraminal stenosis.

2. Mild degenerative change at L2-L3 and at L3-L4. Mild acquired bilateral neural foraminal stenosis or noted at L3-L4. Degenerative disc disease with disc osteophyte complex at L2-l3. However, no evidence for central canal stenosis.

Id. at 428.

Plaintiff stopped working at TDSI on April 11, 2007, because of "chronic neck and low back pain with co morbid conditions of hypertension, fatigue, insomnia, depression and myalgias." Id. at 549. Plaintiff returned to see Dr. Hall on April 30, 2007, complaining of back, hip and leg pain, dizziness, migraines, insomnia and fatigue. Id. at 331.

On May 30, 2007, Plaintiff consulted Dr. Charles Kim for her low back pain that she described as moderate to severe and rated her pain a 5 on a scale of 10. Id. at 432. Plaintiff reported pain all over her body and joints that improved with recent physical therapy, but exacerbated by sitting or standing in one position for extended periods. Id. Plaintiff described her active physical therapy and walking about ten minutes per day as well as house work, but she was sleepy and felt weak all over. Id. Dr. Kim found Plaintiff able to go from sitting to standing without any difficulty, walk on her heels and toes, moved on the exam table quite slowly, and without any significant pain upon internal or external rotation. Id.

Dr. Kim's review of the April 10, 2007 x-rays of Plaintiff's lumbar spine revealed multi-level degenerative disc disease and a previous hemilamenotomy at L4-5. Id. Dr. Kim also reviewed an April 10, 2007 MRI that revealed postoperative changes of the right laminectomy at L4-5. Dr. Kim noted the following: "No recurrent disc herniation, but there is mild facet degenerative changes with ostephyte ridging with moderate acquired right neuroforaminal stenosis and mild left neuroforaminal

stenosis. There are mild degenerative changes at the L2-3 and L-3-4 with mild neuroforaminal stenosis but no evidence of spinal canal stenosis." Id. at 431. Dr. Kim's diagnostic impression was "1) Right L3-4 radicultitis vs less likely meralgia paresthetica since symptoms do come from the back and buttock region. 2) Diffuse pain and arthralgias. 3) Myofascial overlay of the right PSIS. 4) Right L4-5 diskectomy and laminectomy in 2000." Id. at 431.

On June 25, 2007, Plaintiff returned to Dr. Hall, complaining of pain "all over" and radiating to her hip and leg. Id. at 332. Dr. Hall again recommended sleep study. Id. On July 16, 2007, Plaintiff repeated her complaints of fatigue, weakness and pain to Dr. Hall. Id. at 333.

On July 16, 2007, Plaintiff consulted Dr. Kim, who after his physical examination of Plaintiff, rated her pain 4 out of 10, seating ability without distress, and the ability to sit and stand without any difficulty: "[Plaintiff] ambulates with a non-antalgic gait, becomes tearful at times, has some mild tenderness over the lumbar paraspinals, no sensory deficit over the anterior lateral thighs bilaterally." Id. at 430. Plaintiff's manual muscle testing was 5/5 (normal on rating of pain). Id. Dr. Kim gave Plaintiff work restrictions to work light duty with no heavy lifting greater than 20 pounds and with a one minute break to stand and walk for every twenty minutes of sitting. Id. According to Dr. Kim, "[i]t sounded as if [Plaintiff] would be capable of doing this as a customer service rep with a headset; however, [Plaintiff] says she just can not do it." Id. Dr. Kim instructed Plaintiff that she could report his written restrictions to the Defendant to explore any accommodation. Id.

Dr. Kim's notes also reveal that on July 17, 2007, Plaintiff requested that Dr. Kim "remove all traces of that work note from her medical record" and Plaintiff became distraught when told that the note could not be removed given its transcription. Id. at 429. Dr. Kim informed Plaintiff that

his decision was based on her ability to sit comfortably during the examination and walk with a nonantalgic gait. Id. Dr. Kim offered to amend the note to reflect four hours, "but this was not an acceptable option to [Plaintiff]." Id.

Plaintiff underwent a radiological examination on July 17, 2007. Id. at 143. The radiologist concluded: "Degenerative disc disease at C5-6 and possible mild disc space narrowing at C4-5. Osteophytes noted at C4-5 and C5-6. Suspected mild bony encroachment upon the neuroforamina at C4-5 and C5-6. No fractures seen." Id.

Because of her history of headaches, Plaintiff underwent an MRI of her head on July 23, 2007. Id. at 144. The radiologist's impressions were as follows:

1. Suspicious for a small, 0.9 cm filling defect at the anterior – cranial aspect of the 3rd ventricle. Although the location raises the suspicious of a colloid cyst, this most likely represents a partial volume averaging artifact. A dedicated head CT with and without intravenous contrast with thin axial sections through this site may be helpful in the evaluation of this area.

2. Mild component of diffuse cerebral atrophy with ventricular enlargement. This is more than typically observed in a patient of this age.

3. Multiple small foci of signal abnormality in the periventricular white matter. This may represent idiopathic periventricular white matter disease although this is more than typically observed in a patient of this age and would make it difficult to exclude a demyelinating disease as the etiology.

Id. at 145.

On July 30, 2007, due to her abnormal July 23rd MRI Plaintiff had a CT scan that did not reveal any evidence of intracranial hemorrhage. Id. at 146. Dr. Hall referred Plaintiff to the Neurology Center of Middle Tennessee ("NCMT") for Plaintiff's numbness in her arms and legs, as well as her migraine headaches. Id. at 285. On August 2, 2007, Dr. Anthony Casamo of NCMT noted:

8

Mrs. Byrd states that she has had these multiple complaints for a long time, but has had increased low back pain over the last three months. She describes numbness and burning in the right hip and thigh area, and also reports numbness and tingling in her arms and legs that vary in frequency. Her symptoms wax and wane and can occur with sitting or lying, but she feels that they are very rarely occurring with walking or standing. She describes her limbs as feeling like they fall asleep. Symptoms are decreased with movement. She has noticed some increased weakness in her grip strength bilaterally. She also has noticed some heavy pains in her left arm, greater than on the right side, but denies coolness or pallor of the arms. She does, however, report coolness and pallor of her legs at times, and diffuse complaints of joint pain. She has seen a rheumatologist, but does not see any cause for her arthralgais.

She has had extensive lab work and imaging tests, which do not reveal any significant cause for any of her problems. I have discussed this with her at today's visit, as well as discussing it with her husband.

Her husband reports that she is a terrible sleeper, having problems with both inability to get to sleep and stay asleep. He also reports that she snores a lot and has restless sleep through the night, as well as fatigue through the day…

Id. at 285.

On September 4, 2007, Plaintiff underwent a sleep study at the NCMT. Id. at 270. This study revealed that over the course of 224 minutes of sleep, Plaintiff was aroused on 26 occasions with 5 obstructive apneas that never reached stage IV or REM sleep. Id. at 269. Plaintiff repeated this study on September 18, 2007 with 23 arousals over 245 minutes of sleep, no obstructive apneas, and without reaching stage III, IV or REM sleep. Id. at 272.

October 2, 2007, Dr. Casamo reviewed with Plaintiff her sleep study results. Id. at 287. In a letter to Dr. Hall, Dr. Casamo wrote:

Since her last visit here, she has had a hospitalization after a syncopal event. She had not felt right that particular day. She stated that her entire body just felt unusual. She lost consciousness, witnessed by those around her, for three to five minutes, and was sitting at the time the event occurred. There was no tonic-clonic activity, no incontinence, and no tongue of cheek biting. She was weak after the episode, but otherwise felt normal. She has had her recent PSG diagnostic, which shows mild obstructive sleep apnea with an RID of 6.2. The patient was unable to obtain REM

sleep, which I think would have given a more ominous diagnostic conclusion. But due to that lack of REM sleep, insurance is reluctant to initiate treatment with a CPAP machine...

Impression: 1) Obstructive sleep apnea, mild with insurance unwilling to initiate CPAP 2) Paresthesias 3) Myalgias and arthralgias of unknown etiology 4) Depression...

Id. at 287.

On October 15, 2007, Plaintiff returned to Dr. Hall, citing increasing amounts of pain, and Dr. Hall referred Plaintiff for an EMG test. Id. at 336. On October 18, 2007, the EMG test finding showed left ulnar nerve velocity slowed across the elbow and left ulnar nerve incomplete conduction block. Id. at 276. Dr. Robin Gilmore, who reviewed the test results, concluded that Plaintiff had a mildly abnormal study with mild left ulnar neuropathy. Id. On October 16, 2007, Dr. Hall considered Plaintiff to be disabled. Id. at 470.

Following Plaintiff's return visit to NCMT on October 26, 2007, Dr. Casamo noted that Plaintiff "continues to have radiating pain from the back into the right hip and into the gluteal region, but has had her EMG/NCV study which reveals only left ulnar neuropathy. She has no findings indicative of a radiculopathy or further degenerative neuropathy or myelopathy to account for her symptoms." Id. at 158. Dr. Casamo's impression were: obstructive sleep apnea, paresthesias, myalgias, arthralgias, depression, lumbar degenerative disease, and cervical degenerative disc disease. Id. at 158.

On November 13, 2007, Plaintiff received a lumbar epidural steroid injection to treat her radiculopathy. (Docket Entry No. 15, AR at 289). On December 12, 2007, Dr. Hall again noted Plaintiff's diagnosis of fibromyalgia, pain, depression, hypertension, and chronic fatigue. Id. at 337.

On December 20, 2007, Plaintiff received a second lumbar epidural steroid injection, and a "right S1 injection." (Docket Entry No. 15, AR at 290). On January 20, 2008 returned to NCMT. Id. at 292. Dr. Casamo noted that Plaintiff was "having ongoing memory issues which are preventing her from being active." Id. Dr. Casamo's impressions were: "1) Fatigue of unknown etiology. 2) Myalgias and arthralgias of unknown etiology. 3) Lumbar degenerative disc disease, with symptoms of lumbar radiculopathy. 4) Low back pain. 5) Depression." Id.

On February 1, 2008, Dr. Hall examined Plaintiff and noted Plaintiff's chronic pain, sensations of burning and tingling, fibromyalgia and depression. Id. at 338. On February 4, 2008, Dr. Casamo wrote:

> Teresa J. Byrd is a patient of mine, whom I have followed since August 2, 2007. She presented with multiple complaints including low back pain, weakness, fatigue, arthralgias, pareathesias and upper extremity pallor. She has had nerve conduction/EMG studies, a complete lab work-up, polysomnogram and imaging tests.
>
> Thus far she has only had mild findings of disease. Her polysomnogram showed mild obstructive sleep apnea, which her insurance will not cover the treatment. Her NCV/EMG shows mild left ulner neuropathy and , although not confirmed by tests, her history is consistent with radiculopathy down the right leg.
>
> Her lower back pain and radicular symptoms have been treated with medication and two epidural steroid injections, which have not been beneficial.
>
> I do not see that she is currently able to return to work based on her plethora of symptoms and debilitating pain. I also believe that her depression has become severe enough that it and her memory issues would not allow her to perform her work duties even if her physical state could be improved.
>
> Ms. Byrd is being tried on further medications at this time, but from a neurological standpoint is unable to fulfill her work requirements. If you have further questions or require further information, please contact my office.

Id. at 159.

On February 19, 2008, Dr. Rodney Poling, a psychiatrist, counseled Plaintiff who was tearful and cried throughout her interview and her speech was of "slow methodical quality" and difficult to discern. Id. at 128-29. Plaintiff's mood was "useless," displayed a "tearful affect," and insight poor, but her cognition appeared to be generally intact. Id. at 129. Dr. Poling's diagnostic impression was "Major Depression Recurrent Severe" with a current Global Assessment of Functioning ("GAF") score of 50. Id. at 128. Dr. Poling also noted Byrd's history of fibromyalgia, hypertension, migraine headaches, and chronic back pain. Id.

On April 10, 2008, Dr. Leslie Cuevas, an Arthritis Specialist, examined Plaintiff. Id. at 253. Dr. Cuevas' treatment recommendations included "regular, non-strenuous exercise." Id. On April 24, 2008, Dr Poling provided Plaintiff with a note opining that she was "totally disabled and unable to work due to major depression and fibromyalgia." Id. at 385.

On September 17, 2008, Plaintiff complained to Dr. Hall of pain radiating down her arms. Id. at 341. Dr. Hall ordered x-rays of Byrd's cervical spine. The radiologist found:

> Vertebral body heights appear well maintained. There does to be mild disc space narrowing C4-5 and C5-6. Osteophytes are noted at these levels. No fractures are identified. There is straightening of the normal lordotic curvature. Alignment otherwise appears normal and prevertebral soft tissue appear normal. There may be slight bony encroachment upon the neural foramina at C4-5 and C5-6. There is little change as compared to previous exam of 7-17-07.

> Degenerative disc disease at C4-5 and C5-6 with osteophytes noted at these levels and suspected slight bony encroachment upon the neural foramine at these levels. No fractures seen. Straightening of the normal lordotic curvature, possibly on the basis of positioning or muscle spasm.

> . . .

> OPINION: No fracture seen. Osteophytes noted. Slight curvature to the left, possibly on the basis of positioning or mild scoliosis.

Id. at 151.

On November 18, 2008, Dr. Cuevas wrote:

I have been asked to supply a letter on behalf of Ms. Byrd in regards to her claim for Social Security Disability. Ms. Byrd has been a patient of mine since 04/10/08. Previous to this she had been seen by one of our former partners, Dr. Joe Houston. She carries a diagnosis of fibromyalgia syndrome. She does meet ACR criteria with trigger points and diffuse pain. She suffers from severe depression. She has been followed by a psychiatrist but unfortunately has not seen much improvement. Her condition causes pain and decreased stamina.

I do support her claim for disability. She is unable to lift or carry objects that weigh more than 10 pounds for more than two hours in an 8-hour workday. She is unable to stand for more than two hours in an 8-hour workday. She is unable to sit for more than a half-hour to an hour without having to stand, lie down, or walk to relieve pain, fatigue, or pressure. She would have difficulty with stooping, reaching, pushing, pulling, or kneeling secondary to her pain. Fatigue, decreased stamina, and decreased concentration would make it almost impossible for her to compete in a competitive work environment.

This is a chronic condition and expected to last more than 12 months. Again, I do support her claim for disability and do not see any hope that she would be able to return to the work force.

Feel Free to call if you have any additional questions or concerns.

Id. at 72.

On November 18, 2008, Dr. Poling completed a mental demands of employment questionnaire, supporting Plaintiff's claim for Social Security Disability benefits. Id. at 138 –39. Dr. Poling's assessment of Plaintiff's mental status precluded her ability to work. Id.

### 3. Plaintiff's Disability Application

Prior to the latter tests, on or about November 3, 2007, Plaintiff applied for LTD benefits. (Docket Entry No. 4 at ¶ 13). On December 17, 2007, Defendant denied Plaintiff's claim for LTD benefits. Id. at 544. Defendant cited the medical records of Dr. Hall from April 30, 2007 to July 31,

13

2007; Dr. Casamo from August 2, 2007 to October 26, 2007, the lack of any records of a cervical MRI for review; and Dr. Kim's records from May 30, 2007 to July 17, 2007. Id. at 549-51. Defendant also cited a telephone conversation on December 5, 2007, where Plaintiff stated she was unable to work because of poor memory, but the medical records do not reflect a memory problem. Id. at 551. Defendant concluded:

> Although some of your records indicate you were depressed, there is no record of treatment by a psychiatrist or therapist. There are no medical records that indicate you have poor concentration, focus, altered thought process, decreased memory or any other cognitive impairments or vegetative symptoms that would impact your ability to perform the material and substantial duties of your regular occupation.

> A review of the medical documentation does not support a need for restrictions and limitations regarding your hypertension.

> Although you have obstructive sleep apnea, tests showed it was mild with no significant 02 desaturation. It appears tests results were so mild that your insurance carrier would not cover the CPAP. Fatigue is subjective and it appears that you worked with this in the past. None of the records reflect a significant change or tired appearance nor a need for restrictions due to fatigue.

> There are no medical records in file that reflect a diagnosis of Fibromyalgia. From the available records it appears that your diagnostic workup was negative for any findings to support an etiology for these myalgias and arthralgias. There is no medical evidence to support your continued absence from work due to this diagnosis.

> There is very little information on your syncope. It is unclear if you are having further testing for causes of syncope. Due to syncope it is reasonable that your restrictions may include no climbing, no frequent bending, no lifting over 20 lbs., no work at unprotected heights, no working near or with machinery, no driving.

> **Summary**

> Based on our review there is no medical evidence to support, a physical impairment that would prevent you from working at your sedentary occupation. While you may have symptoms requiring medical care and medication, they are not of a severity that would prevent you from working, Therefore, you do not satisfy the definition of disability your LTD and Critical Illness claim for benefits has been disallowed.

14

_Id._

On April 1, 2008, Plaintiff appealed Defendant's decision denying her LTD benefits. _Id._ at

530. The administrative record was referred to Managing Care Managing Claims ("MCMC") for

an independent review by board certified physicians in occupational medicine and orthopedic

surgery. _Id._

On June 25, 2008, Defendant denied Plaintiff's appeal, citing medical records submitted by

Plaintiff up to March 19, 2008. _Id._ at 525, 530.

### Occupational Medical Review by Dr. Antonelli:

The physician reviewer opined that based on the medical documentation contained
in your file, you have functional impairments primarily as a result of your chronic
low back pain. You have a history of lumbar spine surgery in 2000 and have had a
recurrence of low back pain in early 2007. You have findings of degenerative disc
disease in the lumbar spine. It is noted your pain is localized primarily in the low
back and buttock areas. There is no clinical evidence of radiculopathy and you have
not had documented focal neurologic findings that would limit your functionality.

It is noted you have had other complaints and have been diagnosed with depression
and an element of fibromyalgia with chronic myalgias and arthralgias. It is noted your
medications have been changed multiple times and your providers have indicated that
you have not responded. However, again your physical examinations have been
unremarkable and this evidence does not support that the fibromyalgia is debilitating.

It is noted you have had other conditions, including hypertension and migraines that
have not been demonstrated to result in physical limitations. It is noted you have
complained of problems with your memory but no neurocognitive tests have been
done.

In summary, Dr. Antonelli opined that based on the medical records available for
review, the following restrictions and limitations would be appropriate: ability to
frequently sit and occasionally stand and walk. You would require lifting restrictions
should be capable of lifting up to 10 pounds frequently and up to 20 pounds
occasionally. You would not be capable of using a ladder but may use stairs
occasionally. It should be able to drive for 30-60 minutes. You should be able to
occasionally squat, stoop, kneel but should not crouch or crawl. You should not

15

require any restrictions on the use of your hands for telephone use or keyboarding. It is noted these restrictions are likely to be needed for the foreseeable future.

Dr. Antonelli further opined that the medical documentation available for review did not clearly demonstrate any significant adverse side effects including cognitive deficits or sedation that were occurring as a result of your medication use. It is noted your medications have been adjusted several times but there has been no mention of these types of problems in the file.

## Orthopedic Medical Review by Dr. Werntz:

Based upon review of the available records, Dr. Werntz opined that you do have clinical findings on diagnostic studies that would result in functional impairment from April 12, 2007 and forward. Specifically, the lumbar spine MRI obtained in April 2007 revealed some mild age-related degenerative changes including moderate right-sided foraminal stenosis at the LA-5 level, which corresponded to your previous laminectomy procedure. The Cervical spine x-rays obtained in July 2007 again revealed mild findings of disc space narrowing and bony encroachment at C4-5 and C5-6, also age-related in etiology. Finally, your upper extremity and right lower extremity NCS/EMG revealed findings consistent with a mild left ulnar neuropathy, which appears to be related to you leaning on your elbow while sleeping in a recliner. Dr. Werntz opined, all of these findings, essentially mild in severity, would be expected to cause some symptoms of low back pain and possibly neck pain. These findings indicate impairments in sitting, lifting and reaching from an orthopedic standpoint.

Dr. Werntz opined, based upon the diagnostic findings and your clinical exams, from an orthopedic standpoint, you would require the following restrictions of: lifting occasionally up to 20 pounds and frequently up to 10 pounds; standing and walking in 30 minute increments with a five minute break; sitting for up to 30 minute increments with a five minute break; occasional reaching above the shoulder; frequent reaching at waist/desk level and occasional reaching below waist/desk level; no climbing, kneeling, bending, stooping or crawling; no restrictions on handling, fingering, feeling or repetitive hand motions.

It is noted your lumbar spine and cervical spine conditions are largely age-related in etiology, are mild and support above described restrictions. In addition, your mild left ulnar neuropathy appears to be related to leaning on the elbow, and should resolve with behavior modifications of avoidance of leaning on the elbow and prolonged elbow flexion. It is likely that your spinal degenerative conditions will continue to progress over time and the above noted restrictions would remain in place permanently.

Dr. Werntz opined your self-reported pain appears to be somewhat exaggerated when compared to the clinical evidence. Specifically, your lumbar spine MRI shows only mild age related degenerative changes, the most significant of which is moderate right-sided foraminal stenosis at LA-5. Your cervical spine x-rays likewise show only age-related mild degenerative changes and the upper extremity NCS/EMG showed findings of a mild left ulnar neuropathy. Although these conditions may result in some symptoms of pain and limited spine mobility, the clinical evidence does not appear to correlate with the your described symptoms.

## Vocational Assessment:

As previously stated, we review your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location. During our phone conversation of June 24, 2008 I had advised you that we had made several attempts to secure a copy of your Job Description from your employer and were unsuccessful in doing so. I asked you to describe to me in detail the duties of your occupation as a Residential Sales Advisor and you indicated that your job was sedentary in nature, you took calls and were on the phone processing orders for phone service for customers. Given the duties that you described to me it appears your occupation would be classified as sedentary in nature.

The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.

"Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

## Conclusion:

Based on the Physician Reviewer's assessments, you do have some functional impairments based upon the evidence noted on the diagnostic testing. Specifically, your lumbar spine MRI, cervical spine x-rays and upper extremity electrodiagnostic testing. All of these studies revealed mild findings, primarily age-related, but would

not be considered severe or disabling from an orthopedic standpoint beyond the limits described.

It is noted that some of your medical records indicate that you are depressed, however, the medical records contained in your file do not document a record of treatment by a psychiatrist or therapist as of April 12, 2007. There medical records do not substantiate your reports of poor concentration, focus, altered thought process, decreased memory or any other cognitive impairments or vegetative symptoms that would impact your ability to perform the material and substantial duties of your regular occupation.

Based on the Physician Reviewer's assessments, the following restrictions or limitations are indicated: lifting occasionally up to 20 pounds and frequently up to 10 pounds; standing and walking in 30 minute increments with a five minute break; sitting for up to 30 minute increments with a five minute break; occasional reaching above the shoulder; frequent reaching at waist/desk level and occasional reaching below waist/desk level; no climbing, kneeling, bending, stooping or crawling; no restrictions on handling, fingering, feeling or repetitive hand motions.

In summary, the restrictions and limitations as noted above would be within the scope of your occupational duties as a Residential Sales Advisor. It is reasonable that you should be able to accommodate your sitting and standing restrictions with an alternating sit/stand work station. As such, there is no support that you would have been precluded from performing the material and substantial duties of your regular sedentary occupation as a Residential Sales Advisor as of April 12, 2007.

Id. at 530-32.

On January 25, 2009, Dr. Cuevas wrote a second letter to Defendant in support of Plaintiff's

claim for disability benefits, stating:

I have been seeing Ms. Byrd in rheumatology clinic. She has been diagnosed with fibromyalgia syndrome. She is unable to work because of her pain, decreased stamina and decreased concentration. She additionally suffers from severe depression.

I do not believe that she is able to work and do not see her being able to return to work in the near future. I do believe she should be granted long term disability. She does meet ACR criteria for the diagnosis of fibromyalgia and I am a board certified rheumatologist.

Id. at 160.

In a letter dated January 21, 2009, Plaintiff's attorney advised Defendant that he was attaching all medical records, including supplemental records since the initial denial and requested the Defendant to "send contemporaneous copies to me of all correspondence you send and receive from medical or vocational consultants." Id. at 363. On January 27, 2009, Defendant responded that "it need not provide a claimant with copies of documents gathered during the course of an appeal prior to final decision so long as the Company abides by the ERISA regulations mandating that the claimant be provided with appropriate information and documentation at the appropriate stages in the administrative process." Id. at 517. Plaintiff's attorney responded, stating:

> I understand that Prudential is at risk of loss regarding claims under the Plan in which Byrd was enrolled. I also understand that Prudential has a specific duty to provide Byrd with a full and fair review of its earlier administrative denial, and that it has a broader duty to make its decisions solely in the interest of the plan's participants and beneficiaries.
>
> Accordingly, I am writing to ask you for an explanation of Prudential's rationale for its position on this issue in light of Prudential's fiduciary duty to Byrd and to the Plan and its conflict of interest in this mater. In addition, I am writing, pursuant to 29 U.S.C. § 1024(b)(4), 29 U.S.C. § 1133 and 29 C.F.R. §§ 2560-503-1(i)(5) and (m)(8) to request a copy of all material related Prudential's determination of its position on this issue.

Id. at 250.

Defendant referred Plaintiff's supplemental medical records submitted with her second appeal, including Plaintiff's entire file, to Dr. Antonelli and Dr. Werntz and a board certified psychiatrist, Dr. Patrick Lillard. Id. at 513. These three physicians consulted each other. Id. at 226, 239, 247.[1]

---

[1]Dr. Cuevas's January 25, 2009, letter was not considered by the physicians.

Dr. Antonelli reviewed Plaintiff's medical records dating back to July 21, 2003, where Plaintiff was evaluated "for fatigue and wanting to sleep all the time." Id. at 230. Dr. Antonelli noted that Plaintiff was "crying and not feeling well and had frequent headaches," and that she was "diagnosed with anxiety and depression." Id. Dr. Antonelli noted Dr. Kim's May 30, 2007, July 16, 2007 and July 17, 2007 evaluations. Id. at 231-32. Dr. Antonelli reviewed Plaintiff's several visits to Dr. Casamo and noted that on October 2, 2007 Dr. Casamo's impression was "Obstructive sleep apnea but coverage for the CPAP was not authorized. . . . The sleep apnea was considered to be mild." Id. at 234. Dr. Antonelli also reviewed Dr. Casamo's records in January and February 2008 and conclusion that Plaintiff's "depression was severe enough and her memory issues would not allow her to perform work duties even if her physical state could be improved." Id. at 234-35. Dr. Antonelli also noted that Dr. Hall and Dr. Poling considered Plaintiff disabled. Id. at 235. Dr. Antonelli reviewed Dr. Cuevas's November 18, 2008 notation. Id. at 236.

Dr. Antonelli concluded:

I stated to Dr. Lillard that I did not see any objective evidence or clear documentation of physical impairments. However, I questioned whether her insomnia had been evaluated and treated adequately. She had mild sleep apnea noted on a single polysomnogram. Continuous positive airway pressure (CPAP) had been recommended but not authorized. There is a real possibility that she has ongoing and significant insomnia that may be impacting her multiple conditions, including her feelings of fatigue, her headaches, and her chronic pain symptoms.
. . .

**RESPONSE/RATIONALE:**

In my prior review of this claimant's file in 05/08, I opined that the claimant had mild functional impairments and limitations on her activities due to her history of recurrent low back pain. She has a history of lumbar spine surgery in 2000 and had a recurrence of low back pain in early 2007. She has findings of degenerative disc disease in the lumbar spine which provides objective evidence to support her complaints of persistent pain. Her pain is localized primarily in the low back and

buttock areas. There is no objective evidence of radiculopathy and she has not had documented focal neurologic findings that specifically limit the functionality of her extremities.

In addition, she has multiple other complaints and has been diagnosed with depression and an element of fibromyalgia with chronic myalgias and arthralgias. Her medications have been changed multiple times and her providers have indicated that she has not responded. However, again her physical examinations have been unremarkable and this evidence does not support that the fibromyalgia is debilitating. She has other conditions, including hypertension and migraines that have not been demonstrated to result in physical limitations. She has complained of problems with her memory but no objective neurocognitive tests have been done. This complaint will not be further addressed here as it is out of my realm of expertise.

Based on the medical records submitted for review, the claimant is likely to be able to do modified light work, including frequent sitting and occasionally standing and walking. She requires lifting restrictions due to her chronic degenerative disease of her lumbar spine and her diagnosis of fibromyalgia but is capable of lifting up to ten pounds frequently and 20 pounds occasionally. She is not capable of using ladders but may use stairs occasionally. It has been reported that she can drive and she is likely to be able to drive for 30-60 minutes. She has no difficulties with balance and can occasionally squat, stoop, or kneel but should not crouch or crawl. She does not require any restrictions on the use of her hands for telephone use or keyboarding.

Her treatment will continue to include medications primarily. The restrictions described are likely to be required for the foreseeable future and she would not be expected to improve significantly over time even with changes in her medications. The problems with her cervical and lumbar spines are degenerative and likely to worsen with time as she ages.

In addition, her problems with insomnia and fatigue may require additional evaluation and she may well require treatment with CPAP. The documentation reviewed does not clearly demonstrate any significant adverse side effects including cognitive deficits or sedation that have occurred or are occurring as a result of her medication use. Her medications have been adjusted several times but there has been no mention of these types of problems in the file.

Id. at 239-40.

Dr. Werntz reviewed the newly submitted medical data, including the medical opinions of

Dr. Cuevas, Dr. Poling and Dr. Casamo. Id. at 243-44. Dr. Werntz concluded:

Review of the attached documentation does alter my prior assessment, although minimally.

One of the new records provided indicates a clinical exam identifying 18/18 trigger points for the diagnosis of fibromyalgia syndrome, although this is only documented on the 04/10/08 office visit. Cervical spine x-rays obtained on 09/25/08 revealed mild disk space narrowing at C4-C5 and C5-C6 with straightening of the normal lordotic curve and slight bony encroachment upon the neural foramina at C4-C5 and C5-C6. Dr. Cuevas, a rheumatologist evaluated the claimant on 04/10/08 documenting 18/18 trigger points with no synovitis.

Taking into consideration the new x-rays, Dr. Cuevas' diagnosis of FMS, as well as the previous studies including the lumbar spine MRI obtained in 04/07 which revealed some mild age-related degenerative changes including moderate right-sided foraminal stenosis at the L4-5 level, and the NCS/EMG which identified a mild left ulnar neuropathy, the claimant does have a functional impairment. All of these findings, essentially mild in severity, would be expected to cause some symptoms of low back pain, left elbow pain, neck pain, and periscapular pain.

Previously, I had placed the claimant in a light capacity. However, with the diagnosis of possible fibromyalgia/fibromyalgia syndrome in a deconditioned and overweight middle-aged patient with electro-diagnostically positive left cubital tunnel syndrome and degenerative disc disease of the lower lumbar and lower cervical spine; I would recommend decreasing the lifting/pushing/ pulling/carrying requirements to fifteen pounds occasionally rather than 20 pounds occasionally.

In summary, the claimant is capable of working in a modified light capacity with the following restrictions: lifting/pushing/pulling/carrying up to fifteen pounds occasionally and up to ten pounds frequently; no lifting/pushing/pulling above shoulder level; standing or walking in 30 minute increments with a five minute break to sit; sitting in 30 minute increments with a five minute change of position to stand/walk; frequent reaching at waist/desk level and occasional reaching below waist/above shoulder level; no climbing ladders, kneeling, bending, stooping, squatting, or crawling. The claimant is able to occasionally climb stairs and drive for 30-60 minutes. The claimant would have no restrictions on handling, fingering, keyboard use, feeling, or repetitive hand motions. She has no restrictions with use of hand controls and foot controls. She should avoid repetitive left elbow flexion greater than 90° and avoid leaning on her left elbow.

It should be noted that although Dr. Cuevas did not opine that the claimant could work, she gave recommendations in a letter dated 11/18/08 which would place the claimant in a sedentary capacity: "She is unable to lift or carry objects that weigh more than ten pounds for more than two hours in an eight hour work day. She is

unable to stand for more than two hours in an eight hour work day. She is unable to sit for more than a half-hour to an hour without having to stand, lie down, or walk to relieve pain, fatigue, or pressure. She would have difficulty with stooping, reaching, pulling, or kneeling secondary to her pain." Additionally Dr. Cuevas' treatment recommendations on 04/10/08 included "regular, non-strenuous exercise."

Id. at 247-48.

Dr. Dillard concluded:

The first clear reference to the claimant having a mental health problem was advanced by Anthony Casamo PA-C, in a letter dated 02/04/08. He stated: "I also believe her depression has become severe enough that it and her memory issues would not allow her to perform her work duties even if her physical state could be improved."

. . . . Dr Poling stated the claimant "reports a long term history of depression." There are no specific details. He stated her depression was complicated in years past by migraine headaches. However, "she was doing reasonably OK; working at TDS in Waynesboro until last April when she apparently, 'got down in my back.'"

The claimant, according to Dr. Poling, had depression on and off for many years "though it has been worse recently." The claimant had been treated with various anti-depressants and at the time of the 02/19/08 evaluation, the claimant "was taking Tramadol for her chronic pain and Celexa. With the claimant being more tearful, upset, and guilty about not working, Dr. Hall referred her to Dr. Poling. The claimant described symptoms of excessive sleep, guilty ruminations, low mood, low energy, low concentration and decreased activity. "She doesn't really have suicidal thoughts but has a very slow and viscous response to questions and says "I can't help it." The claimant also has sleep apnea, which may account for some of the daytime sleepiness and for which she takes Provigil.

. . .

The claimant was seen in follow-up by Dr. Poling on 03/05/08, 03/27/08 and 04/24/08 and the notes seem to indicate she was somewhat better with each succeeding visit. On 05/02/08 the claimant felt the Abilify made her choke and she stopped it. There were no other significant issues and the claimant continued on 225 mg of Effexor XR. On a 07/18/08 visit: the claimant complained of not feeling good in the morning and stated "I am in a fog," and Dt. Poling tapered the Effexor and started Prestiq.

On a subsequent visit on 08/14/08 the claimant was doing better, "not as bad as before." Monthly visits in 10/08 and 11/08 did not reveal a significant change and the claimant was changed to Prestiq 100 mg and was on Buspar 30 mg two times per day. It should be noted there is no mention of a cognitive deficit and there has not been a cognitive assessment documented.

On 11/19/08 Dr. Poling faxed a form to the claimant's lawyer which was titled "Treating Source Mental Demands of Employment Questionnaire." On that form Dr. Poling felt the claimant had "a mental or physical condition that has caused a substantial impairment..." He indicated the claimant did not have the ability, among others, to remember locations and work-like procedures: did not have the ability to understand and remember very short and simple instructions or have the ability to carryout such instructions ..." However, there is no clinical information supporting the level of impairment described by Dr. Poling.

There is no other mental health or psychiatric documentation available in the submitted material. There is no information about the claimant's current status and if any additional evaluation has been carried out.

. . .

Based on the documents reviewed, the claimant does not have psychological and/or cognitive impairment(s) from 04/12/07 forward.

The claimant has been treated for depression but there is no information provided that supports a condition that would cause such impairments that would translate to any restrictions or limitations. There is not a cognitive assessment in the submitted documents. In fact, the psychiatrist, in his initial examination did not find a cognitive deficit, though the nature of his assessment is not detailed.

Id. at 223-24, 227.

On February 27, 2009, Defendant again affirmed the denial of benefits. Id. at 510.

## B. CONCLUSIONS OF LAW

"Under ERISA, an insurer granted discretion to determine benefits by the terms of a plan is subject to an extraordinarily lenient standard of review. The 'arbitrary and capricious' standard requires only that the claim fiduciary's decision be 'rational in light of the plan's provisions.'" Nicholas v. Standard Ins. Co., No. 00-1728, 2002 WL 31269690, at *7 (6th Cir. Oct. 9, 2002)

(quoting Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988)). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." David v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989). Given that the plan grants Prudential the discretion and authority to determine eligibility for LTD benefits and to construe and interpret all terms and provisions of the Policy, id. at 625, the Court reviews the benefits decision at issue under an arbitrary and capricious standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

> The Sixth Circuit defined the arbitrary and capricious standard as follows:
>
> The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Courts must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.

Smith v. Continental Cas. Co., 450 F.3d 253, 259 (6th Cir.2006) (citing Williams v. Int'l Paper Co., 227 F.3d 706, 712 (6th Cir.2000)).

For judicial review, an administrator's decision must be based on a reasonable interpretation of the plan and the administrator must have the ability to articulate a reasoned, evidentiary-based explanation for the outcome. Powell v. Premier Mfg. Support Servs., Inc., No. 1-05-0012, 2006 WL 1529470 at *8 (M.D. Tenn. June 1, 2006).

To determine whether an abuse of discretion occurred, the Court must also consider whether a conflict of interest exists. A conflict of interest exists "when the insurer both decides whether the employee is eligible for benefits and pays those benefits." Evans v. Unumprovident Corp., 434 F.3d

866, 876 (6th Cir.2006) (citing Gismondi v. United Techs. Corp., 408 F.3d 295, 299 (6th Cir.2005)).

In Evans, the Sixth Circuit synthesized a definition of this conflict for ERISA purposes, stating:

> "[T]here is an actual, readily apparent conflict . . . not a mere potential for one" where a company both funds and administers [the policy] because "it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits."... [B]ecause [the] defendant maintains such a dual role, "the potential for self-interested decision making is evident."

Id. (citations omitted).

Given that the issue is LTD benefits and the payment of these benefits will involve substantial funds, the Court concludes that the Defendant has a conflict of interest in this action.

As to the effect of this conflict, the Supreme Court stated in Firestone: "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Firestone, 489 U.S. at 109 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). Less deference may be given upon proof that the denial was motivated by self-interest or bad faith. See Peruzzi v. Summa Medical Plan, 137 F.3d 431, 433 (6th Cir.1998).

"The arbitrary and capricious standard is the least demanding form of judicial review." Hunter v. Caliber Sys., Inc., 220 F.3d 702, 710 (6th Cir. 2000) (citation and internal quotation marks omitted). Yet, the Sixth Circuit clearly stated that the arbitrary and capricious standard is not the equivalent of total deference to plan administrators:

> [M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious ... standard does not require us merely to rubber stamp the administrator's decision." Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (6th Cir.2004) (citing McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161,

172 (6th Cir.2003)). Indeed, "[d]eferential review is not no review, and deference need not be abject." McDonald, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." Id.

Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005). In conducting an arbitrary and capricious review of the administrative record, the Court is to consider only the facts known to the administrator or fiduciary at the time it made the decision. Id. at 378-79.

The administrator's decision must be based on a reasonable interpretation of the plan, Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health and Welfare Trust Fund, 203 F.3d 926, 933 (6th Cir. 2000), and it must be "possible to offer a reasoned explanation, based on the evidence, for a particular outcome." Evans, 434 F.3d at 876 (quoting Perry v. United Food & Commercial Workers Dist. Unions 405 & 422, 64 F.3d 238, 241 (6th Cir.1995)). The administrator's decision "will be upheld 'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'" Id. ( quoting Baker v. United Mine Workers of America Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir.1991)). The Court's review "'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issue.'" Id. (quoting McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir.2003)). As a general rule, the administrator's written decision and the information in the administrative record are the bases for judicial review. Peruzzi, 137 F.3d at 433-34.

Plaintiff contends that Defendant violated ERISA's "full and fair" review requirements at 29 U.S.C. § 1133(2)[2] and 29 C.F.R. §§ 2560.502-1, -503-1 by refusing to disclose its correspondence

---

[2]29 U.S.C. § 1133(2) provides: "[E]very employee benefit plan shall afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by

27

with or its consultative reports prior to issuing Defendant's final administrative denial and when the

Defendant refused to disclose the operational policies for not disclosing consultative reports prior

to issuing a final administrative denial. According to Plaintiff, the disclosure of such information

would have allowed Plaintiff's physicians to contact the reviewers and provide additional

assessments regarding Plaintiff's alleged disability. In support,[3] Plaintiff cites 29 C.F.R. § 256.503-

1(j)(3), (5)(i) that states:

> Manner and content of notification of benefit determination on review. The plan
> administrator shall provide a claimant with written or electronic notification of a
> plan's benefit determination on review. . . . . In the case of an adverse benefit
> determination, the notification shall set forth, in a manner calculated to be understood
> by the claimant--
> (3) A statement that the claimant is entitled to receive, upon request and free of
> charge, reasonable access to, and copies of, all documents, records, and other
> information relevant to the claimant's claim for benefits. . . .
>
> (5) In the case of a group health plan or a plan providing disability benefits--
>
> (i) If an internal rule, guideline, protocol, or other similar criterion was relied upon
> in making the adverse determination, either the specific rule, guideline, protocol, or
> other similar criterion; or a statement that such rule, guideline, protocol, or other
> similar criterion was relied upon in making the adverse determination and that a copy
> of the rule, guideline, protocol, or other similar criterion will be provided free of
> charge to the claimant upon request . . .

Id.

---

the appropriate named fiduciary of the decision denying the claim."

[3]Plaintiff also cites to several statutes and regulations that are irrelevant to her contention. 29 U.S.C. § 1024(b)(4), states that a participant must be provided with a copy of summary plan descriptions and annual reports, along with "any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 C.F.R. § 2560.502-1(b)(1) does not exist. 29 C.F.R. § 2560.502-1 relates to requests for enforcement under § 502(b)(2). Presumably, Plaintiff refers to 29 C.F.R. § 2560.503-1(b) that relates to the reasonableness of claims procedures.

As to an appeal of an adverse benefits determination, 29 C.F.R. § 2560.503-1(h)(2) outlines the procedural requirements for a full and fair review of the decision. Balmert v. Reliance Standard Life Ins. Co., 601 F.3d 497, 502 (6th Cir. 2009).

> These procedural requirements include (1) the allowance of 60 days, after notification of an adverse benefit determination, in which a claimant may file an administrative appeal; (2) the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits; (3) the right to be provided, upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to the claim for benefits; and (4) the requirement that the fiduciary take into account all comments, documents, records, and other information submitted by the claimant relating to the claim, regardless of whether such information was submitted or considered in the initial benefit determination.

Id.

As to whether § 2560.503-1(h)(2) requires the production of documents generated during the pendency of an administrative review and prior to the final determination, the Sixth Circuit noted that such a proposition "is dubious in light of the holdings of two of our sister circuits, see Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1245-46 (11th Cir. 2008) (holding that a claimant has no right to documents generated during the pendency of an administrative review); Metzger v. UNUM Life Ins. Co. of Am., 476 F.3d 1161, 1165-68 (10th Cir.2007) (same)." Id. at 502-03.[4]

In Glazer, the plaintiff argued that she was not provided a "full and fair review" by failing to provide her with a copy of the reviewer's report during the pendency of her appeal. 524 F.3d at 1245. The Eleventh Circuit concluded:

---

[4]Plaintiff argues that unlike the claimant in Balmert, Plaintiff exercised her right to receive and rebut the medical assessment purchased by Defendant. However, the two actions are factually distinct. In Balmert Defendant had a doctor personally evaluate Plaintiff, and Plaintiff knew that report would be part of the record for review, whereas here Plaintiff requested documents generated by the doctors who only reviewed the medical records submitted by Plaintiff.

Glazer's argument is contrary to the plain text of the regulations. Subsection (h)(2)(iii) requires the plan administrator to produce all "relevant" documents. A document is relevant if it "[w]as relied upon" or "[w]as submitted, considered, or generated in the course of making the benefit determination." Reliance had not "relied upon" the Hauptman report or used the report "in the course of making the benefit determination" until the determination had been made. After Reliance reached its final decision, all relevant documents generated during the review and initial claim determination had to be produced to the claimant. This requirement would be superfluous if the claimant had a right to the documents during the pendency of the review.

Id. (citations omitted).

Likewise, in Metzger, the Tenth Circuit adopted the district court's reasoning that:

If plaintiff were allowed to rebut the opinions of professionals consulted at [the administrative appeal] stage, then the layman claims administrator would once again be faced with the possibility of receiving new medical opinions and judgments from plaintiff's experts. Subparagraph (h)(3)(iii) specifically requires such evidence be evaluated by qualified healthcare professionals.... Thus, if read according to plaintiff's view, the regulations set up an endless loop of opinions rendered under (h)(3)(iii), followed by rebuttal from plaintiff's experts, followed by more opinions under (h)(3)(iii), and so on.

476 F.3d at 1166.

Based on these cited authorities, the Court concludes that under the precedents cited by the Sixth Circuit, the Defendant was not required to produce the requested documents prior to Defendant's decision to deny Plaintiff's claim for LTD benefits.

As to Plaintiff's contention that 29 C.F.R. § 2560.503-1(j)(3) and (5) require the disclosure of the requested policies prior to issuing a final decision, those subparagraphs only require that a denial letter refer to an operational policy only if that policy were relied upon in denying a plaintiff's claim for LTD benefits. Plaintiff only requested Defendant's policy for not providing Plaintiff with the documents relating to Defendant's independent reviewers prior to its final decision. Plaintiff does not argue that Defendant relied on any such policy in denying her claim for LTD benefits. For

the same reasons discussed above, the Court concludes that Plaintiff has not shown such a policy prior to Defendant's final determination. On March 17, 2009, Defendant provided Plaintiff "a copy of Prudential's Group Disability Memo's which provides us with guidance on handling ERISA claims." (Docket Entry No. 15, AR at 507).

Accordingly, the Court concludes that under the cited Sixth Circuit decision Plaintiff's arguments lack merit and that Defendant's failure to provide the documentation does not establish that Defendant acted arbitrary or capriciously in denying Plaintiff's claim.

Plaintiff also argues that Defendant's reliance on the assessments by Dr. Werntz and Dr. Antonelli in denying Plaintiff's initial claim and on Plaintiff's appeal is evidence that Defendant did not conduct a "full and fair review." Plaintiff cites 29 C.F.R. § 2560.503-1(h)(3)(v) that states:

> The claims procedures of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless . . . the claims procedures–
>
> (v) Provide that the health care professional engaged for purposes of a consultation . . .shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual.

Id.

Dr. Werntz and Dr. Antonelli did not make the initial adverse determination, but were consulted on the *appeal* of the adverse benefit determination. Accordingly, the Court concludes that Plaintiff's reliance on this regulation is misplaced.

Next, Plaintiff argues that large sections of Defendant's medical assessments were not written by the physicians to whom they are attributed, challenging the independence of the reports. Plaintiff cites that the "Review Data" section of their respective reports that lists the same documents in the

same sequence and each report's Review Data sections reveal that these sections have been altered slightly to disguise the fact that they are identical. Defendant responds that each of the three reviewers received all medical documentation in Plaintiff's file, i.e. the same information, and MCMC arranged all three reviews and efficiency caused preparation of one list of those records.

Each of these physician's reports focused on a particular field of medicine--orthopedic surgery, occupational medicine, and psychiatry--to assess Plaintiff's functional impairment based upon the symptoms in each physician's respective field. The Court does not view the submission of the same list of medical records as evidence Defendant's decision was arbitrary and capricious. Plaintiff does not contend that the three physicians did not author their respective substantive conclusions. Accordingly, the Court concludes that this claim is without merit.

Plaintiff next argues that Plaintiff's treating physicians uniformly considered her disabled, that Defendant's reviewers did not contact Plaintiff's physicians, and that Defendant's reviewers did not address the implications of Plaintiff's September 4 and September 18, 2008 sleep studies.

Defendant argues that under the terms of the Plan documents, Plaintiff bears the burden of submitting her proof of claim and the reasons for her physicians' opinions were her responsibility and the law does not require that Defendant's reviewers to consult Plaintiff's physicians and solicit additional opinions. Defendant also argues that the reviewers independently considered Plaintiff's medical evidence and that Dr. Cuevas's disability opinion was inconsistent with Dr. Cuevas's own records, that Dr. Lillard's report demonstrates that he found deficiencies in a number of areas of Dr. Polling's report, Plaintiff's treating physician Dr. Kim did not consider Plaintiff disabled, and that the reviewers considered Plaintiff's sleep apnea, but did not view it as disabling.

Where there are conflicting opinions of treating and consulting physicians in an ERISA

action, the Sixth Circuit has observed:

> Generally, when a plan administrator chooses to rely upon the medical opinion of one
> doctor over that of another in determining whether a claimant is entitled to ERISA
> benefits, the plan administrator's decision cannot be said to have been arbitrary and
> capricious because it would be possible to offer a reasoned explanation, based upon
> the evidence, for the plan administrator's decision.

McDonald, 347 F.3d at 169. Thus, while there is "'nothing inherently objectionable about a file

review by a qualified physician in the context of a benefits determination,' Calvert v. Firstar Fin.,

Inc., 409 F.3d 286, 296 (6th Cir.2005), [such a review] is a factor to be considered in reviewing the

propriety of an administrator's decision regarding benefits." Evans, 434 F.3d at 877; Kalish v.

Liberty Mutual, 419 F.3d 501, 508 (6th Cir. 2005) ("Whether a doctor has physically examine

examined the claimant is indeed one factor that we may consider in determining whether a plan

administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its

consulting physician.").

The Supreme Court held that the mandatory deference accorded to treating physicians under

the Social Security Act is inapplicable to ERISA claims. Id.

> "[C]ourts have no warrant to require administrators automatically to accord special
> weight to the opinions of a claimant's physician; nor may courts impose on plan
> administrators a discrete burden of explanation when they credit reliable evidence
> that conflicts with a treating physician's evaluation." Black & Decker Disability Plan
> v. Nord, 538 U.S. 822, 834 (2003). The Supreme Court nonetheless admonished that
> "[p]lan administrators ... may not arbitrarily refuse to credit a claimant's reliable
> evidence, including the opinions of a treating physician." Id.

Id.

Here, the evidence reflects that the independent reviewers considered Plaintiff's treating

physicians' treatments, assessments and opinions. Although Dr. Hall, Dr. Casamo, Dr. Poling, and

Dr. Cuevas provided statements supporting Plaintiff's claim of disability, Dr. Kim did not. On May 30, 2007, Dr. Kim rated Plaintiff's pain as 5 on a scale of 10 and noted that her pain improved with recent physical therapy, but was exacerbated by sitting or standing in one position for extended periods; Plaintiff was active with physical therapy, walked about ten minutes per day, performed house work; was able to go sit and then stand without difficulty; could walk on her heels and toes; moved on the examination table albeit quite slowly; and did not have any significant pain with internal or external rotation. (Docket Entry No. 15, AR at 432). On July 16-17, 2007, Dr. Kim gave Plaintiff a work note stating that she could return to work light duty, provided heavy lifting no greater than 20 pounds and a one minute break to stand and walk for every twenty minutes of sitting. Dr. Kim opined that these restrictions would allow Plaintiff to work as a customer service representative and told Plaintiff that she could take the note to her work to explore an accommodation, but Plaintiff declined. Plaintiff also requested that Dr. Kim "remove all traces of that work note from her medical record," but Dr. Kim informed Plaintiff that his decision was based on her ability to sit comfortably during the exam and walk out of the room with a nonantalgic gait. Id. at 429-30.

Moreover, citing the newly submitted evidence of Dr. Cuevas's conclusions, Dr. Werntz altered her original assessment of Plaintiff's capability of light capacity to modified light capacity. Dr. Werntz concluded that Plaintiff was capable of working with the following restrictions: lifting/pushing/pulling/carrying up to fifteen pounds occasionally and up to ten pounds frequently, standing or walking in 30 minute increments with a five minute break to sit, and sitting in 30 minute increments with a five minute change of position to stand/walk. Id. at 247-48. Dr. Werntz also noted that Plaintiff was able to drive for 30-60 minutes and would not be restricted in handling,

fingering, keyboard use, feeling, or repetitive hand motions. Dr. Werntz noted that this determination was consistent with Dr. Cuevas's opinion.

> It should be noted that although Dr. Cuevas did not opine that the claimant could work, she gave recommendations in a letter dated 11/18/08 which would place the claimant in a sedentary capacity: "She is unable to lift or carry objects that weigh more than ten pounds for more than two hours in an eight hour work day. She is unable to stand for more than two hours in an eight hour work day. She is unable to sit for more than a half-hour to an hour without having to stand, lie down, or walk to relieve pain, fatigue, or pressure. She would have difficulty with stooping, reaching, pulling, or kneeling secondary to her pain." Additionally Dr. Cuevas' treatment recommendations on 04/10/08 included "regular, non-strenuous exercise."

Id.[5]

Dr. Antonelli also thoroughly reviewed the medical evidence and concluded that Plaintiff's lifting restrictions were based upon Plaintiff's chronic degenerative disease of her lumbar spine and her diagnosis of fibromyalgia. Consistent with Dr. Cuevas and Dr. Kim, Dr. Antonelli concluded that Plaintiff was capable of lifting up to ten pounds frequently and 20 pounds occasionally. Dr. Antonelli also noted that Plaintiff reportedly could drive and Plaintiff was likely able to drive for 30-60 minutes. Dr. Antonelli further noted that Plaintiff did not demonstrate any significant adverse side effects including cognitive deficits or sedation as a result of her medication use. Id. at 239-40.

Dr. Dillard noted that Plaintiff reportedly had a long term history of depression without specific details and that her depression was complicated in years past by migraine headaches, but she had been doing reasonably well until April 2007 when she apparently, "got down in her back." Id. at 223-24, 227. Dr. Poling did not find a cognitive deficit in his initial examination, although the nature of his assessment was not detailed. Dr. Dillard also noted that there was not any mention of

---

[5]While Dr. Cuevas's January 25, 2009 note was not considered by the reviewers, the Court concludes that the note is essentially a recitation of Dr. Cuevas's November 18, 2008 note opining that Plaintiff was unable to return to work and adds nothing new.

cognitive deficits at subsequent visits and no cognitive assessment was ever documented, there was not any clinical information supporting the level of impairment described by Dr. Polling in his questionnaire, and there was not any other mental health or psychiatric documentation in the record. Id.

Plaintiff contends that the consultants' lack of curiosity regarding the reasons why Plaintiff's physicians considered her disabled reveals evident bias against Plaintiff's claim. In particular, Plaintiff argues that if Dr. Lillard wanted to understand the reasons why Dr. Poling considered Plaintiff disabled, he could have contacted Dr. Poling. However, there is not a per se requirement that an independent reviewer must contact a treating physician.

In Bell v. Ameritech Sickness and Acc. Disability Ben. Plan, Nos. 09-1562, 09-1565, 2010 WL 4244126 (6th Cir. Oct. 15, 2010), the Sixth Circuit stated, "This court has held that, under certain circumstances, when a plan administrator explicitly instructs an independent reviewer to contact a claimant's physician, the reviewer's failure to do so may contribute to a finding that the review was not 'full and fair.'" Id. at *5 (citing Smith v. Cont'l Cas. Co., 450 F.3d 253, 261-62 (6th Cir. 2006)). The Court further elaborated that "an independent reviewer's failure to obey an explicit instruction to contact a treating physician may compromise the review process, *but only* where the independent reviewer also neglects to engage in a complete and consistent review of the record." Id. (emphasis in original). The Sixth Circuit noted that "[t]he situation might be different if the plan documents themselves required the plan administrator to contact the claimant's treating physician, but that is not the case here." Id. at *5 n.7. In addressing the plaintiff's contention that the independent reviewer's failure to comply with its own physician-contact procedures may have served as evidence of bias, the Sixth Circuit stated, "It is unclear, however, how NMR's failure to contact Bell's physicians

36

would have demonstrated bias. Moreover, NMR's doctors grounded their opinions on the absence of objective medical information, which Bell's physicians had been given many opportunities to submit, and which was easy to confirm on review." Id. at *5 n.9.

The Court concludes that the independent reviewers' declination to contact Plaintiff's physicians did not exhibit bias as their decisions were supported by Plaintiff's medical records and some of their opinions were grounded on the absence of medical information that Plaintiff was required to submit.

Finally, Plaintiff argues that the independent reviewers did not address directly the implications of Plaintiff's September 4 and September 18, 2008 sleep studies. However, Dr. Antonelli noted that Plaintiff's insomnia might be impacting her multiple conditions, including her feelings of fatigue, her headaches, and her chronic pain symptoms. Id. at 239. Moreover, Dr. Casamo noted that Plaintiff's sleep study revealed only mild sleep apnea. Id. at 287.

Based upon Plaintiff's medical records, the administrative record and cited Sixth Circuit decisions, the Court concludes that Defendant's decision to deny Plaintiff long-term disability benefits was neither arbitrary nor capricious. Accordingly, the Court concludes that judgment on the administrative record should be granted in Defendant's favor and Plaintiff's motion for judgment on the administrative record (Docket Entry No. 25) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _17th_ day of December, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge